UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

N.J., by and through his next friends, )
J.J. and J.J.,                          )
                                        )
                    Plaintiff,          )
                                        )
        v.                              )     Case No. 4:04CV857 RWS
                                        )
NORTHWEST R-1 SCHOOL DISTRICT,  )
                                        )
                    Defendant.          )

**MEMORANDUM AND ORDER**

This matter is before me on Plaintiffs' motion for judgment on the administrative record

[#18]. Plaintiffs J.J. and J.J. are the parents of N.J., a five-year-old boy. They contend that

Defendant Northwest R-1 School District ("Northwest" or the "District") violated the Individuals

with Disabilities Act ("IDEA"), 20 U.S.C. § 1400, *et seq.*,[1] by failing to provide N.J. with a free

appropriate public education ("FAPE"). Plaintiffs request that I void all of the individualized

education programs ("IEPs") prepared for N.J. by Northwest, that I order Northwest to provide

N.J. with compensatory education, that I order Northwest to compensate J.J. and J.J. for any out

of pocket educational expenses they incurred as a result of Northwest's alleged failure to provide

a FAPE, and that I award J.J. and J.J. their attorneys' fees spent at the administrative level and

pursuing this action in this Court because they were the "prevailing party" on a significant issue at

the administrative level. Northwest argues that the preponderance of the evidence shows that it

provided N.J. with a FAPE and that an award of attorneys' fees is not proper because it submitted

an offer of judgment in accordance with 20 U.S.C. § 1415(i)(3)(D).

--------

[1] All citations are to the 2004 version of the IDEA.

I will deny Plaintiffs' motion because the preponderance of the evidence establishes that Northwest provided N.J. with a FAPE, and I will not award attorneys' fees to Plaintiffs because I find that they were not the "prevailing party" at the administrative level as defined by law.

# I. PROCEDURAL HISTORY

## A. Issues Raised Before the Due Process Panel

This matter was heard by a three-person due process panel on April 20-22, 2004. Plaintiffs presented the panel with the following issues:

(1) In September of 2002[, N.J.'s] parents sought special education services from [Northwest].

(2) Prior to the first IEP meeting with [Northwest], [N.J.'s] parents submitted reports from his First Steps Occupational, Speech and Developmental Therapists [sic], which recommended specific services for [N.J.] that included but were not limited to, weekly occupational therapy and speech therapy; [N.J.'s] Neurologist [sic] diagnosed [N.J.] as having Autism Spectrum Disorder.

(3) In September of 2002[,] the IEP team issued an IEP for [N.J.] that did not incorporate the services recommended by [N.J.'s] First Step Therapists [sic]; [Northwest's] IEP did not dispute [N.J.'s] medical diagnosis of Autism Spectrum Disorder.

(4) In January of 2003, at the request of [N.J.'s] parents, the IEP team met to consider parental requests to amend [N.J.'s] IEP and increase the services that [N.J.] was to receive from [Northwest].

(5) In January of 2003[, N.J.'s] IEP was amended so that [N.J.] was to receive among other services, 120 minutes of weekly speech therapy, 60 minutes of occupational therapy consultation per month and a weekly total of 720 minutes of special educational services; although [Northwest] questioned [N.J.'s] medical diagnosis of Autism,[2] it presented no medical diagnosis contrary to this finding.

(6) At the January IEP meeting[, N.J.'s] parents presented a report to

---

[2]As will be discussed below, the term "Autism" is ambiguous.

[Northwest] from his Neurologist [sic] which included an occupational therapy recommendation.

(7)     This recommendation indicated that [N.J.] received 60 minutes of weekly occupational therapy to improve his sensory processing abilities.

(8)     In February of 2003, after [Northwest] received the report provided by [N.J.'s] parents, which was completed by [N.J.'s] private Occupational Therapists [sic], the IEP Team refused to modify or change its January 2003 IEP.

(9)     [Northwest] did not conduct an occupational therapy evaluation of [N.J.] until April 2003; the evaluation done by [Northwest] did not include any testing of [N.J.'s] sensory processing abilities.

(10)    Prior to April 2003[, Northwest] did not have any occupational therapy in place for [N.J.]

(11)    [Northwest] failed to provide occupational therapy consultation for [N.J.] prior to April of 2003 as stipulated by their [sic] IEP. Additionally, following their [sic] April 2003 evaluation, [Northwest] continued to fail to meet the occupational therapy IEP requirement in that no plan to assist [N.J.] with his sensory processing abilities was ever issued by [Northwest].

(12)    The January [2003] IEP required [N.J.] to receive 120 minutes of weekly speech therapy.

(13)    After January of 2003[, N.J.] did not receive the required speech therapy in that some of the so called "services" he was receiving were in a group setting and not the one on one setting suggested in the IEP; not only is time shared in group therapy settings not equivalent to one on one therapy, but [N.J.] also has not received all of the daily and weekly services for speech therapy as set forth under the IEP.

(14)    After January of 2003[, N.J.] did not receive 720 minutes of weekly services from [Northwest] as required by the IEP.

(15)    Due to [Northwest's] failures to follow the program set forth by [N.J.'s] IEP of January of 2003, he was denied a FAPE.

(16)    Since September of 2002[, Northwest] has not provided [N.J.] with occupational therapy as requested by [N.J.] and his parents and recommended by his Neurologist [sic] and Occupational Therapists [sic];

this failure has resulted in the denial of a FAPE to [N.J.]

(17) Since September of 2002[, N.J.] and his parents have requested that sign language be incorporated into his education by a person trained in sign language to provide assistance to [N.J.] in his communicative skills; [Northwest] has failed to comply with this request which has inhibited his ability to communicate with others.

(18) That the failure to provide [N.J.] with sign language training has caused [N.J.] to be denied a FAPE by [Northwest].

(19) That due to the failures of [Northwest] to follow the January 2003 IEP and [Northwest's] refusal to include the services for [N.J.] requested by his parents since September of 2002, [N.J.'s] parents have incurred expenses for private speech therapy and occupational therapy services for [N.J.]

(20) That [Northwest's] failure to provide [N.J.] with a FAPE has resulted in the removal of [N.J.] from [Northwest] and his enrollment in a private educational facility by his parents; this has caused [N.J.'s] parents to incur expenses for [N.J.'s] education.

(21) That the proposed remedies sought by [N.J.] are as follows:

(a) Reimbursement to [N.J.'s] parents for all private occupational therapy sessions provided for [N.J.] since October of 2002.

(b) Reimbursement to [N.J.'s] parents for all private speech therapy sessions provided for [N.J.] since October of 2002.

(c) Reimbursement to [N.J.'s] parents for all private school cost incurred [sic] for educating [N.J.] since October of 2002.

(d) Reimbursement to [N.J.'s] parents for all attorney fees and cost incurred [sic] in bringing this action against [Northwest].

**B.      The Panel's Findings and Conclusions**

On June 11, 2004, the panel issued the following conclusions:

(1)      The Panel concludes that [Northwest] compiled sufficient data and information to properly evaluate [N.J.] in August and September 2002. The Panel further finds that [Northwest] correctly assessed [N.J.'s] disability and developed appropriate IEPs during the 2002-2003 school year.

(2)      The Panel further finds that the IEPs developed for [N.J.] throughout the 2002-2003 school year were reasonably calculated to provide, and did provide [N.J.] with educational benefit.

(3)      The Panel further finds that [N.J.] made progress on the goal and objectives contained in his IEP during the 2002-2003 school year.

(4)      The Panel further finds that [Northwest] provided a FAPE to [N.J.] during the 2002-2003 school year.

(5)      The Panel further finds that because [Northwest] provided [N.J.] with a FAPE during the 2002-2003 school year, the Parents are not entitled to reimbursement.  The Panel therefore denies reimbursement.

(6)      The Panel concludes that, although the 2002-2003 IEPs contained some inadequacies, the IEPs were reasonably calculated to provide [N.J.] with educational benefit and that any inadequacies are either de minimus or could be rectified at Panel direction.

(7)      The Panel further finds that the Parents failed to cooperate in the IEP process and are, therefore, not entitled to reimbursement.

(8)      The Panel denies reimbursement for the time frame between August 2003 to the present, for which Petitioners seek such relief because Howard Park was and remains to restrictive a placement and is, therefore, not appropriate.

(9)      The Panel finds that, in placing [N.J.] at Howard Park and purchasing private speech and occupational therapy, the Parents assumed the financial risk per Burlington[3] and, therefore, reimbursement is not appropriate.

---

[3] School Committee of Burlington v. Dep't of Education of Mass., 471 U.S. 359, 374 (1985) ("[P]arents who unilaterally change their child's placement during the pendency of the

(10)     The Panel further finds that the Parents never rejected [N.J.'s] IEP and never furnished written notice to [Northwest] of their intent to unilaterally place [N.J.] in a private setting and seek reimbursement.  By failing to do so, the Panel finds that the Parents failed to comply with the statutory imperatives for reimbursement.  The Panel, therefore, denies the Parents' claim for reimbursement.

(11)     The Panel finds that [Northwest] agreed to conduct an occupational therapy evaluation on [N.J.] in February 2003, and that this evaluation was to include a sensory integration component.

(12)     The Panel further finds that [Northwest] failed to complete the sensory integration component as part of the occupational therapy evaluation it completed in April 2003.

(13)     The Panel further finds that because of the failure to include a sensory integration component as agreed, [Northwest's] occupational therapy evaluation was incomplete.  Because the occupational therapy evaluation was incomplete, [N.J.'s] sensory needs may not have been accurately assessed, and he may not have been furnished with appropriate occupational therapy services.

(14)     The Panel further finds that in order to assess [N.J.'s] current sensory needs, he should be re-evaluated.

Plaintiffs filed suit in this Court pursuant to 20 U.S.C. § 1415(i)(2)(A).  I have received the record of the administrative hearing, and the matter has been fully briefed.

## II.     STANDARD OF REVIEW

In this proceeding, I am required to make an independent determination of the issues decided by the due process hearing panel and State Level Review Officer using a preponderance of the evidence standard.  20 U.S.C. § 1415(i)(2)(B)(iii).  I must accord "due weight" to the state administrative proceedings.  Hendrick Hudson Central School District Board of Education v. Rowley, 458 U.S. 176, 205-06 (1982).  This level of deference is less than the substantial

review proceedings, without the consent of state or local officials, do so at their own financial risk.").

evidence test commonly applied in administrative law cases, but takes into account the fact that

the state hearing panel had the opportunity to observe the demeanor of the witnesses.

Independent School Dist. No. 283 v. S.D. by J.D., 88 F.3d 556, 561 (8th Cir. 1996).

Finally, it is well settled that courts should not "substitute their own notions of sound

educational policy for those of the school authorities which they review." Rowley, 458 U.S. at

206.

## III.    FINDINGS OF FACT

N.J.'s parents first began to have concerns about his cognitive development at age one.  In

May 2001, N.J. was evaluated by the Missouri Department of Mental Health and was found

eligible for the Missouri First Steps program due to a fifty-percent delay in communication ability.

N.J. received the services of the First Steps program until he transitioned to Northwest in

September 2002.

In August 2002, N.J. was referred to the Special Services Cooperative of Jefferson

County (the "Co-op")[4] to evaluate whether he was eligible for special education.  He was referred

because of concerns over his communication abilities and because he had a medical diagnosis of

Autism Spectrum Disorder ("ASD"), which is a set of disorders also known as Pervasive

Developmental Disorder ("PDD").[5]

_____

[4] The Co-op provides Early Childhood Special Education Services to ten school districts, including Northwest.  Additionally, it conducts the evaluations of students potentially eligible to receive Early Childhood Special Education Services.

[5] Strock, Margaret, *Autism Spectrum Disorders (Pervasive Developmental Disorders).* NIH Publication No. NIH-04-5511, National Institute of Mental Health, National Institutes of Health, U.S. Department of Health and Human Services, Bethesda, MD (2004) p. 2, available at http://www.nimh.nih.gov/publicat/autism.cfm.   "[C]hildren with ASD demonstrate deficits in 1) social interaction, 2) verbal and nonverbal communication, and 3) repetitive behaviors or

At the request of N.J.'s parents, the Co-op received the reports and evaluations of N.J.'s First Steps provider, Sensory Solutions, and those of St. Louis Children's Hospital. The results of the Co-op's initial evaluation of N.J. found that he had significant delays in communication. Specifically, the Co-op's initial evaluation found that N.J. had slight delays in his expressive language skills, significant delays in his articulation skills, and poor intelligibility. The Co-op's initial evaluation also found that N.J. had an IQ in the above average/gifted range of mental ability[6] and that he had an average probability of having autism.[7] The Co-op concluded that N.J. met the initial criteria to receive an educational diagnosis of Young Child with a Developmental Delay and was therefore eligible to receive Early Childhood Special Education services.

On September 4, 2002, N.J.'s IEP Team met and developed his initial IEP.[8] The September 2002 IEP Team was comprised of N.J.'s mother, local agency representative Jeanne Rothermel, special education teacher Julie Leftwich, First Steps speech pathologist Susan Hammett-Sears, and Parents as Teachers educator Cindi Nipper.

N.J.'s mother testified at the hearing that the IEP Team reviewed all of the available evaluations in creating N.J.'s initial IEP. One of the evaluations available to the IEP Team was a Developmental Therapy Evaluation performed by Sensory Solutions when N.J. was two years

_____

interests." Id. at 4.

[6] The Co-op administered the Leiter-R IQ test, and N.J. obtainted a Full IQ of 144.

[7] The Co-op administered the Gilliam Autism Rating Scale ("GARS"), and N.J. obtained an Autism Quotient of 92, indicating an average probability of Autism.

[8] Individualized education program and individualized education program team are defined at 20 U.S.C. § 1414(d). The requirements for developing an IEP are set forth at 34 C.F.R. § 300.346.

old.  That evaluation stated that N.J. had a medical diagnosis of PDD.  N.J.'s mother testified at the hearing that she agreed entirely with that evaluation.

The initial IEP Team identified three goals for N.J.: to "[i]ncrease overall language skills by 6 months," to "increase overall intelligibility," and to "improve responses to environmental stimulation by 50% . . ."  The initial IEP set forth a number of objectives and benchmarks to achieve the intended goals.  Finally, the initial IEP called for 180 minutes per week of individual and small group instruction in preacademics and 60 minutes per week of speech therapy services, for a total of 240 minutes of special education minutes in Co-op programs.  N.J.'s mother approved the initial IEP.

Approximately one week after the initial IEP meeting, N.J.'s mother contacted the Co-op and informed Julie Leftwich that she could not get N.J. to his 60 minute speech therapy sessions on Fridays, the day of the week they were scheduled to take place.  N.J.'s mother was a student at that time, and her school schedule conflicted with N.J.'s school schedule.  As a result of N.J.'s mother's inability to get N.J. to the scheduled speech sessions, they had to be incorporated into the 180 minutes of instruction in preacademics.  This arrangement continued until the following IEP meeting, which was held in November 2002.

On November 22, 2002, N.J.'s IEP Team reconvened and formulated a new IEP.  Present at the meeting were N.J.'s mother, Co-op speech therapist Becky Mueller, and Jeanne Rothermel.  The November IEP was initiated because Becky Mueller suspected that N.J. had "apraxia of speech."[9]  The November IEP called for 300 minutes per week of individual and small group

---

[9] "Apraxia of speech, also known as verbal apraxia or dyspraxia, is a speech disorder in which a person has trouble saying what he or she wants to say correctly and consistently. It is not due to weakness or paralysis of the speech muscles (the muscles of the face, tongue, and lips)."

instruction in preacademics and 60 minutes per week of speech therapy. At Mueller's suggestion, N.J.'s speech therapy services were changed from one 60 minute session per week to two 30 minute sessions.

By January 2003, N.J.'s mother had increasing concerns over N.J.'s behavioral problems. At N.J.'s mother's request, the IEP Team reconvened on January 10, 2003. The January IEP called for 540 minutes per week of individual and small group instruction in preacademics, 60 minutes per month (15 minutes per week) of occupational therapy, and 120 minutes per week of speech therapy.

As of January 10, 2003, N.J. was receiving his speech therapy services from Howard park. On or about January 15, 2003, N.J.'s mother contacted Leftwich and requested that N.J. receive his speech therapy services from the Co-op. Leftwich granted the request, and N.J. began receiving all of his services from the Co-op.

The January IEP stated that N.J. would receive a total of 720 minutes (12 hours) per week of services from the Co-op. As a result of the increase in minutes, the Co-op increased the number of days that N.J. would receive services from two to four. Leftwich testified at the hearing that N.J. received services from the Co-op four days per week, three hours per day.[10]

_____

*Apraxia of Speech*, National Institute on Deafness and Other Communication Disorders (2002), <u>at</u> http://www.nidcd.nih.gov/health/voice/apraxia.asp.

[10] There was a debate below over whether N.J. actually received 720 minutes of total services. This is because the calculation of the individual services does not equal 720 minutes. That is, (540 weekly minutes) plus (15 weekly minutes) plus (120 weekly minutes) equals 675 minutes. At the hearing, Leftwich testified that she made a mathematical error when she computed the minutes for the IEP. She testified that N.J. was actually receiving 585 minutes of individual and small group instruction in preacademics. And she testified that N.J. received 720 minutes per week of services from the Co-op. Plaintiffs introduced no evidence to the contrary. As a result, I find by a preponderance of the evidence that N.J. received 720 minutes per week of

N.J.'s IEP Team met again on February 7, 2003, to review the changes made to N.J.'s IEP in January. The IEP Team agreed that N.J. had made progress as a result of the increase in minutes made to the January IEP. Because N.J. was making progress, the IEP Team decided to continue with the January IEP. During the meeting, the IEP Team discussed whether Applied Behavior Analysis (ABA) therapy would have been appropriate for N.J. The team decided that ABA therapy was too restrictive, and that in light of the progress N.J. was making, it was unnecessary.

During the meeting, N.J.'s mother discussed the results of a recent occupational therapy evaluation performed at Howard Park. There was conflicting evidence at the due process hearing as to whether N.J.'s mother produced the Howard Park occupational therapy evaluation at the IEP meeting for the IEP Team to review. N.J.'s mother testified that she brought it to the meeting. Julie Leftwich testified that she did not think it had been produced at the meeting. Leftwich's recollection was bolstered by the fact that the meeting minutes did not specify that the document was produced and considered. Leftwich recalled that N.J.'s mother told Leftwich that she would mail the results of that evaluation to the Co-op for inclusion in N.J.'s file.

After reviewing the evidence, I find that it is unlikely that N.J.'s mother produced the occupational therapy evaluation at the February 7, 2003, meeting. The minutes for all of the IEP meetings document what evaluation papers were produced and reviewed at the meetings. Because there is no documentation of the evaluation being produced at the meeting, I find by the preponderance of the evidence that N.J.'s mother did not produce it for the IEP Team to review.

On February 21, 2003, Julie Leftwich and N.J.'s mother spoke on the phone about the

therapy from the Co-op.

possibility of having the Co-op perform an occupational therapy evaluation on N.J. Leftwich told N.J.'s mother that she would send her the appropriate paperwork so that N.J.'s mother could authorize the evaluation. The agreement between Leftwich and N.J.'s mother was that the evaluation was to include both a fine motor and a sensory integration component.

In response to the phone conversation of February 21, 2003, Leftwich sent N.J.'s mother a form to provide written authorization for the occupational therapy evaluation. As of April 3, 2005, N.J.'s mother had not returned the form to the Co-op, despite numerous requests by Leftwich. After having waited for written authorization, Leftwich decided to have N.J. evaluated on the basis of N.J.'s mother's oral authorization. On April 3, 2003, occupational therapist Amber Enloe evaluated N.J. The result of the evaluation was that N.J. scored in the average range of fine motor skills for a person of his age. The evaluation did not contain a sensory integration component. Leftwich testified at the hearing that a sensory integration component should have been included in the evaluation.

On April 14, 2003, Leftwich wrote a letter to N.J.'s mother indicating that the occupational therapy evaluation had been performed on the basis of N.J.'s mother's verbal authorization of February 21, 2003. Leftwich requested that N.J.'s mother return the written authorization form as soon as possible, and that when she received the form she would send the evaluation results to N.J.'s mother. N.J.'s mother returned the written authorization form on June 3, 2003, seven weeks after Northwest performed the evaluation. On June 5, 2003, the Co-op sent N.J.'s mother a copy of the occupational therapy evaluation.

Until mid-August 2003, N.J.'s mother was planning on returning N.J. to the District for the 2003-2004 school year. On about August 16 or 17, 2003, N.J.'s mother requested that

Northwest transport N.J. to a day care center located outside of the District's boundaries. She made the request because there would not have been anyone at N.J.'s home to get him off the bus after school. Linda Werner, N.J.'s case manager, told N.J.'s mother that it was Northwest's policy not to transport students outside of the District, so Northwest would not be able to transport N.J. to the day care center as requested. Because of the transportation issue, N.J.'s mother decided not to return N.J. to Northwest. N.J.'s mother testified that had Northwest agreed to transport N.J. to the day care center, she would have returned him to the District for the 2003-2004 school year.

In August 2003, N.J.'s mother unilaterally placed N.J. at Howard Park. N.J.'s mother did not inform the District of her decision to remove N.J. from the Co-op.

## IV.  ANALYSIS

### A.  *Whether the Northwest Provided N.J. with a FAPE*

The IDEA requires participating states and their public education agencies, such as the Co-op, to provide disabled students with a free appropriate public education. 20 U.S.C. § 1400 *et seq.*; Honig v. Doe, 484 U.S. 305, 308 (1988).

A free appropriate public education is defined as special education and related services that: (1) have been provided at public expense, under the public supervision and direction, without charge, (2) meet the standards of the educational agency, (3) include an appropriate preschool, elementary, or secondary school education in the State involved, and (4) are provided in conformity with the IEP. 20 U.S.C. § 1401(8).

An education is appropriate under the IDEA where the state provides sufficient support services to allow the disabled child to benefit educationally from that instruction. Rowley, 458

U.S. at 190. While the benefit must be more than trivial, the statute does not require the state to maximize the potential of each disabled child. Id. Rather, the IDEA's goal is "more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside." Id. at 195. Achievement of passing marks and advancement from grade to grade are important, but not dispositive, factors in assessing educational benefit. Id. at 203.

Plaintiffs argue that Northwest did not provide N.J. with a FAPE because the IEP's were not tailored to N.J.'s unique needs, because Northwest ignored N.J.'s diagnosis of autism, and because N.J. made less than meaningful advancement in education.

    1.    *Whether the IEP's Were Tailored to N.J.'s Needs*

    a.    20 U.S.C. § 1414(c)(1)(A) Requirements

The IDEA requires school districts to "review existing evaluation data on the child, including . . evaluations and information provided by the parents of the child . . ." in preparing the initial IEP. 20 U.S.C. § 1414(c)(1)(A).

Plaintiffs claim that an occupational therapy report was conducted in March 2002 and that Northwest failed to consider it in developing N.J.'s initial IEP. In their motion, Plaintiffs argue that,

> Northwest did not provide a FAPE to N.J. in September of 2002, because it failed to consider the results of N.J.'s most recent evaluations. For example, N.J.'s occupational therapy report of March 2002 recommended that N.J. receive occupational therapy two times per week, because N.J. had difficulty in adapting to sensory input and had characteristics of integration disorder. Despite this conclusion, no sensory integration services or occupational therapy services were included within N.J.'s initial IEP. In fact, the March 2002 report was ignored by Northwest.

Plaintiffs' argument is unsupported by the record. In support of their claim that a March 2002 occupational therapy evaluation exists, and that Northwest ignored it, Plaintiffs cite to ten pages of the transcript and to the Panel's findings of fact. None of the ten pages in the transcript to which Plaintiffs cited refer to a March 2002 occupational therapy evaluation. The Panel's findings of fact make no mention of a March 2002 occupational therapy evaluation. And Plaintiffs did not include any March 2002 occupational therapy evaluation in their exhibits. In short, Plaintiffs have not provided me with any evidence that a March 2002 occupational therapy evaluation existed for the initial IEP Team to review. As a result, Plaintiffs' argument on this ground is without merit.

Contrary to Plaintiffs' argument, the record reflects that the initial IEP Team complied with the requirements of 20 U.S.C. § 1414(c)(1)(A). N.J.'s mother testified that the initial IEP Team considered the evaluations from N.J.'s First Steps providers. And the initial evaluation performed by the Co-op indicates that the evaluations of N.J.'s First Steps providers and the evaluation of the Missouri Department of Health were considered.

b.     Occupational Therapy and Sensory Integration

Plaintiffs claim that Northwest did not provide N.J. with a FAPE because N.J. made no educational progress involving sensory integration and occupational therapy. Plaintiffs claim that N.J.'s physician, Dr. Dennis Altman, prescribed 60 minutes per week of occupational therapy for N.J. on September 12, 2002, and that Northwest failed to implement the prescribed occupational therapy. However, Plaintiffs have not presented any evidence that they made Northwest aware of the September 12, 2002, prescription for occupational therapy.

During the hearing, N.J.'s mother testified that she put the prescription in N.J.'s binder to

take to school. She did not testify that she checked with Northwest to confirm that it received the prescription. Nor did she request an updated IEP at that time. When she did request an updated IEP in January 2003, Northwest reconvened the IEP Team and occupational therapy consult services were added to the January 2003 IEP.

Plaintiffs are correct that Northwest is required under the IDEA to accept reports and evaluations in formulating IEPs for its students. However, the record reflects that Northwest accepted all of the reports and evaluations that it was presented with and considered them in formulating N.J.'s IEPs. I find that Northwest fulfilled its duty to accept reports and evaluations as required by the IDEA. As a result, Plaintiffs have failed to demonstrate that Northwest did not tailor N.J.'s IEPs to his unique needs.

<blockquote>
2.     *Whether Northwest Failed to Provide N.J. with a FAPE Because it did not Consider him to be Autistic*
</blockquote>

Plaintiffs contend that Northwest failed to provide N.J. with a FAPE because it "ignored his autism diagnosis." N.J. received a GARS autism quotient indicating an average probability of autism. Plaintiffs claim that an autism quotient indicating an average probability of autism is a medical diagnosis of autism. During the hearing, Julie Leftwich testified that autism was not a major area of concern for the IEP Team in formulating N.J.'s IEPs. Plaintiffs argue that Leftwich's lack of concern indicates that Northwest ignored N.J.'s autism. Plaintiffs claim that if Northwest ignored N.J.'s diagnosis of autism, then it could not possibly have tailored the IEPs to N.J.'s needs.

The weight of the evidence does not support Plaintiffs' interpretation of the autism quotient. The only witness to testify at the hearing as to how to interpret the GARS autism

quotient was Julie Leftwich.  On direct examination, Leftwich testified:

> It was found, based on the GARS, that [N.J.] had an average probability of autism.  What that means is that he would have an average probability just like you or I would have an average probability.  It was not an indication based on that particular rating scale, that autism was a major area of concern for him.

Plaintiffs did not cross-examine Leftwich regarding her interpretation of N.J.'s autism quotient.  Nor did Plaintiffs introduce any evidence that would demonstrate that Leftwich's interpretation of N.J.'s autism quotient was incorrect.  As a result, the only evidence before me on this issue shows that an autism quotient that indicates an average probability of autism does not equal a diagnosis of autism.  To the contrary, it indicates that the subject is no more likely to have autism than the average person.  As a result, Plaintiffs have not shown that Northwest ignored N.J.'s medical diagnosis.[11]

I find by a preponderance of the evidence that the Co-op and Northwest complied with the procedural requirements of the IDEA and that the Co-op and Northwest properly considered all of the evaluation papers they were presented with.  As a result, Plaintiffs are not entitled to relief on the ground that the Co-op and Northwest ignored N.J.'s medical diagnosis.

_____

[11] Additionally, it is worth noting that the term "autism" is ambiguous.  The term "autism" is commonly used to mean either "Autism Spectrum Disorder" or "Autistic Disorder."  E.g., Pauline A. Filipek, et. al., *The Screening and Diagnosis of Autism Spectrum Disorders*, 29 Journal of Autism and Developmental Disorders 439, 440 (1999).  Autism Spectrum Disorder ("ASD"), and the synonymous term Pervasive Developmental Disorder ("PDD"), are blanket terms that "refer to a wide continuum of associated cognitive and neuro-behavioral disorders . . ." Id. at 439.  Specific disorders included under the blanket terms ASD or PDD include Autistic Disorder, Rett's Disorder, Childhood Disintigrative Disorder, Aspberger's Disorder, and Pervasive Development Disorder-Not Otherwise Specified ("PDD-NOS").  American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision (2000) at 69-84 [hereinafter *DSM IV-TR*].  On September 17, 2002, N.J.'s physician, Dr. Altman, diagnosed N.J. with PDD-NOS.  A diagnosis of PDD-NOS is appropriate where the patient's "presentations . . . do not meet the criteria for Autistic Disorder . . ."  *DSM IV-TR* at 84.

### 3. Whether N.J. Made More Than Trivial Advances in Education

Plaintiffs assert that N.J. made less than meaningful advances in education. Plaintiffs do not cite to any evaluations performed as evidence of the assertion. Nor do Plaintiffs cite to any portion of the transcript as evidence of the assertion.

To the contrary, N.J.'s mother testified at the hearing that the February IEP Team, which she was a member of, agreed that N.J. had made educational progress as a result of the increase in minutes from 360 to 720 per week. Emily Schlitz, N.J.'s private speech therapist, testified that by May 2003, N.J. had made progress in speech therapy.

Additionally, Northwest produced evidence that N.J. made educational progress under the IEPs. Becky Mueller testified that the progress reports and evaluation of goals demonstrated that N.J. made consistent progress on the goals and objectives included in his IEPs during 2002-2003 school year. The Co-op's student progress reports bolster Mueller's testimony.

I find by a preponderance of the evidence that N.J. made meaningful advancement on the goals and objectives specified in the IEPs and that Northwest provided N.J. with a FAPE. As a result, I find for Defendants and against Plaintiffs on Count II of Plaintiffs' Complaint.

### B. Whether Plaintiffs may Recover Attorneys' Fees Pursuant to the IDEA as the "Prevailing Party" at the Due Process Hearing

Plaintiffs contend that an award of attorneys' fees should be granted because they were the "prevailing party" at the due process hearing. Northwest contends that Plaintiffs may not be awarded attorneys' fees under the IDEA because it made a timely offer of settlement, which Plaintiffs rejected.

The IDEA contains a fee-shifting provision: "In any action or proceeding brought under

this section, the court, in its discretion, may award reasonable attorneys' fees as part of the costs to the parents of a child with a disability who is the *prevailing party*." 20 U.S.C. § 1415(i)(B) (emphasis added).

However, under certain circumstances, the court may not award attorneys' fees:

Attorneys' fees may not be awarded and related costs may not be reimbursed in any action or proceeding under this section for services performed subsequent to the time of a written offer of settlement to a parent if—

> (I) the offer is made within the time prescribed by Rule 68 of the Federal Rules of Civil Procedure or, in the case of an administrative proceeding, at any time more than 10 days before the proceeding begins;
> (II) the offer is not accepted within 10 days; and
> (III) the court or administrative hearing officer finds that the relief finally obtained by the parents is not more favorable to the parents than the offer or settlement.

20 U.S.C. § 1415(i)(D)(I).

Under Fed. R. Civ. P. 68, an offer of judgment is binding on the parties if it is made "[a]t any time more than 10 days before the trial begins . . ."

Northwest's argument that it is immune from liability for attorneys' fees because it made an offer of settlement is incorrect. The offer of settlement was not timely.

It is undisputed that Northwest made an offer of settlement on April 10, 2004. It is also undisputed that the hearing began on April 20, 2004. When computing any time under the Federal Rules, "the day of the act [or] event . . . from which the designated period of time begins to run shall not be included." Fed. R. Civ. P. 6(a). April 10 is exactly 10 days prior to April 20. As a result, under the plain language of the statute and the Federal Rules, Northwest does not qualify for relief from attorneys' fees under 20 U.S.C. § 1415(i)(D)(I) because it did not make the offer of settlement *more than* 10 days prior to the hearing as required by 20 U.S.C. § 1415(i)(D)

and Fed. R. Civ. P. 68.

However, in order for Plaintiffs to qualify for an award of attorneys' fees under 20 U.S.C. § 1415(i)(B), I must find that they were the "prevailing party" at the hearing below. "A litigant is a 'prevailing party' if he obtains 'actual relief on the merits of his claim [that] materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.'" Birmingham v. Omaha School Dist., 298 F.3d 731, 734 (8th Cir. 2002) (quoting Farrar v. Hobby, 506 U.S. 103, 111-12 (1992)).

Under this standard, I find that Plaintiffs were not the prevailing party at the administrative level. The Panel rejected the vast majority of Plaintiffs' claims. And as to the only issue to which Plaintiffs were successful, there was no material alteration of the relationship between Plaintiffs and Northwest. The Panel ordered Northwest to "complete a new occupational therapy evaluation of [N.J. that] include[s] a sensory integration component." However, Northwest had already agreed to complete an occupational therapy evaluation including a sensory integration component as of February 23, 2003. The record reflects that Northwest could have performed a sensory integration evaluation as early as February 2003 had it not been for the fact that N.J.'s mother failed to provide written authorization to Northwest to perform the evaluation[12] and because of Northwest's inadvertent failure to perform that evaluation when it retested N.J. on April 3, 2003. As a result, I find that the Panel's decision did not "modify[] the defendant's behavior" as required by Birmingham, and Plaintiffs are not entitled to recover attorneys' fees under the IDEA. I find for Defendants and against Plaintiffs on Count I of Plaintiffs' Complaint.

---

[12] As is stated above, N.J.'s mother did not return the written authorization until June 3, 2003, more than three months after Leftwich agreed to have a sensory integration test performed.

## V.    CONCLUSION

For the foregoing reasons, I find by a preponderance of the evidence that N.J. was afforded a free appropriate public education under the Individuals with Disabilities Education Act, and Plaintiffs are not entitled to relief.  Additionally, Plaintiffs are not entitled to an award of attorneys' fees because they were not the prevailing party at the administrative hearing.

Accordingly,

**IT IS HEREBY ORDERED** that the Court finds in favor of Defendant and against Plaintiffs on Plaintiffs' claim brought pursuant to 20 U.S.C. § 1400 *et seq*.  Plaintiffs' motion for judgment on the record [#18] is **DENIED**.

Dated this <u>24th</u> day of <u>October</u>, 2005

_____
RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE